UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RENEE MARKER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 04 C 7933 |
| v. | ) |
| | ) Judge George M. Marovich |
| NORTHROP GRUMMAN SPACE & | ) |
| MISSIONS SYSTEMS CORPORATION | ) |
| SALARIED PENSION PLAN, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Renee Marker ("Marker") filed a claim against defendant Northrop Grumman Space & Missions Systems Corporation Salaried Pension Plan (the "Plan") seeking benefits under the Plan pursuant to § 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

The parties have filed cross-motions for summary judgment. For the reasons set forth below, the Court denies defendant's motion for summary judgment and grants plaintiff's motion for summary judgment.

**I.    Background**

The parties agree on all of the material facts and have filed a joint statement of uncontested material facts. Accordingly, the following facts are undisputed.

Plaintiff Marker was once married to the late Robert Marker, who was a participant in the defendant Plan by virtue of his employment with TRW (a company acquired by Northrop Grumman Corporation) and/or Northrup Grumman Corporation from 1967 to 1987. When Robert Marker turned 55 in 1994, he had a vested right to a pension benefit under the Plan. Robert Marker's right allowed him to elect either to wait and begin receiving benefits when he

turned 65 (in November 2004) or to take a reduced benefit anytime after he reached the age of 55.

Marker married Robert Marker in 1992, and the two divorced in 2001. On June 20, 2001, the Circuit Court of Kane County entered a Judgment for Dissolution of Marriage, which provided, in relevant part:

> TRW Pension Plan: The parties agree that [Mr. Marker] will at the time the TRW pension benefits can be exercised (December 2004), elect the 100% Joint and Survivor Annuity Option with the understanding [Mr. Marker] will receive 100% of the pension payments until he expires, and [Marker] the remaining benefits until she expires as provided by the TRW Plan.

(Judgment for Dissolution of Marriage).

### Marker's request for benefits and the Plan's denial

Robert Marker died on January 22, 2003. Soon after, Marker sought benefits under the Plan. On March 3, 2003, Marker's counsel submitted to the Plan a draft domestic relations order ("DRO") in an apparent attempt to get the Plan's approval of it as a Qualified Domestic Relations Order ("QDRO") before submission to the Kane County Circuit Court Judge. Marker's letter to the Plan did not mention Robert Marker's death.

The Plan responded on March 14, 2003. (The March 14, 2003 letter suggests the Plan may have responded earlier, but no evidence of a prior response has been submitted to the Court.) The March 14, 2003 letter stated:

> It has recently been brought to my attention by the TRW Benefits Service Center that Mr. Robert Marker died on January 22, 2003 (a fact which was not mentioned in your March 3, 2003 letter). If I had known this fact when I reviewed your draft QDRO, I would have responded differently.
>
> I have reviewed the portion of the Markers' Marital Settlement Agreement, date June 20, 2001, providing Renee Marker's sole right under this provision is to be designated as the joint annuitant with respect to the annuity to be provided to Mr. Marker when he elects to take that annuity. No mention whatsoever is made of any right to be considered as his spouse for purpose of a pre-retirement survivor annuity. Given the fact that Mr. Marker died before he elected to commence

> payment of his benefit, there is no benefit that will be payable to him. As such, any right Ms. Marker may have had under the Marital Settlement was extinguished with his death.
>
> Given that Ms. Marker currently has no rights under the TRW Salaried Pension Plan, it is not necessary for you to prepare a revised QDRO. Any QDRO that you might provide will be rejected as unacceptable under ERISA and the Internal Revenue Code.

(Plan's March 14, 2003 Letter). For reasons that are not clear in the record, the Plan sent Marker another letter three days later, on March 17, 2003. That letter stated, in relevant part:

> After researching your request concerning receiving pension benefit's [sic], on behalf of Mr. Robert Marker, this is what we have found: Under the terms of the applicable TRW Salaried Pension, Life insurance and Health and Life plans no survivor benefit is payable.
>
> The Marker Marital Settlement Agreement has been reviewed, and it has been determined, due to the provisions of that document, that you are not eligible for any pension payments, as the ex-spouse of Mr. Marker. The agreement provided that you be designated as the joint annuitant, at the time that Mr. Marker would have made a retirement election. Your agreement does not provide any pre-retirement survivor benefits. Because he died before commencing any benefits, you are therefore ineligible to receive any benefits. Please review the enclosed documents.

(Plan's March 17, 2003 Letter).

The Circuit Court of Kane County subsequently entered several domestic relations orders relating to Marker and the Plan. The parties have not submitted to this Court the orders the Circuit Court of Kane County entered on August 14, 2003 and October 24, 2003. Nor have the parties submitted to this Court the Plan's denials of Marker's requests for benefits based on the August 14 and October 24, 2003 court orders.

For reasons that are not clear, the Circuit Court of Kane County issued another domestic relations order on July 26, 2004 (the "Order"). The Order stated, in relevant part:

> NOW, THEREFORE, in consideration of the foregoing, the court orders as follows:

1. It is intended that this Order constitute a "Qualified Domestic Relations Order" (hereinafter "QDRO") as defined in section 414(p) of the Internal Revenue Code of 1986, as amended ("Code") and section 206(d)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), so as to provide certain Plan benefits, as hereinafter specified, to an "Alternate Payee" (within the meaning of section 414(p)(8) of the Code and section 206(d)(3)(K) of ERISA). This Order shall be administered and interpreted in conformity with the provisions thereof which shall preempt any provisions of state law inconsistent therewith. The Court shall retain jurisdiction to amend this Order upon motion of any party, but solely for the purposes of establishing or maintaining its status as a QDRO. No amendment of this Order shall require the Plan to provide any type or form of benefit, or any option, not otherwise provided under the then applicable terms of the Plan.
2. This Order applies only to the TRW Salaried Pension Plan, a defined benefit pension plan qualified under section 401(a) of the Code and exempt from taxation under Section 501(a) of the Code. The Plan Administrator is Northrop Grumman Space & Mission Systems Corp., 1900 Richmond Road, Cleveland, Ohio 44124.
3. The Participant under the Plan is:
    Name: Robert R. Marker
    Address: 109 Lakeside Drive, Apt. 216
    St. Charles, IL 60174
    SSN: * * *
    Date of Birth: 11/27/39
    The Alternate Payee under the Plan is:
    Name: Renee K. Marker
    Address: 533 Stewart Street
    Batavia, IL 60510
    SSN: * * *
    Date of Birth: 8/16/54
    Changes of address with respect to this Order should be provided by written notice directed to the Office of the Plan and the address of the Plan Administrator.
4. One Hundred Percent (100%) of the Participant's normal retirement benefit accrued under the Plan as of January 23, 2003 are assigned to Alternate Payee based on the provisions of the Plan in effect on the date of the QDRO.
5. * * *
6. The Alternate Payee shall be treated as a surviving spouse of the Participant for purposes of any pre-retirement survivor benefit payable under the Plan based upon the interest awarded under Paragraph 4 of this Order.
7. * * *

> 8. This Order supersedes all prior Orders entered by this court in relation to the Plan.

(Order).

Marker sent the Order to the Plan on August 9, 2004 and requested benefits under the Plan. Marker sent follow-up letters on August 25, 2004 and September 28, 2004. On October 11, 2004, sixty-two days after Marker's most-recent request for benefits, the Plan responded. In its response, the Plan stated:

> Our office is in receipt of your correspondence dated September 28, 2004, in regards to the above-referenced Plan.
>
> Please note, in light of new information that was not readily available when our office received an order to review on February 6, 2004 [sic]. However, it has come to our attention that the above Participant died on January 22, 2003, before the proposed [sic] was reviewed and qualified. Please be advised the senior counsel previously made reference in the enclosed letter dated March 14, 2003, that the Alternate Payee was not entitled to any of the Participants [sic] benefits. A letter, which the Alternate Payee was cc'd on [sic].
>
> As such, there are no benefits to be allocated to the Alternate Payee. Therefore, the file will be closed.

(Plan's October 11, 2004 Letter).

Marker filed her ERISA denial of benefits claim in this Court. The parties have filed cross-motions for summary judgment.

**Relevant Plan provisions**

The Plan provides for a pre-retirement spouse's benefit. The Plan provides, in relevant part:

> 3.4 Preretirement Spouse's Benefit
> (a)  If a Participant who was an Employee on or after August 23, 1984 dies on or after Earliest Retirement Age with a vested right, the Participant's eligible Spouse will receive the benefit that would be payable if the Participant had retired with a Qualified Joint and Survivor Annuity on the day before the Participant's death.
> * * *
> (d)  Notwithstanding the above paragraphs, no Preretirement Spouse's Benefit will be provided to an eligible Spouse unless the Participant and Spouse shall have been married throughout the one year period ending on the date of the Participant's death, except as provided under a QDRO. Furthermore, the failure of any eligible Spouse to (I) notify the Board of a participant's death; (ii) maintain a current address on the Board's records; and/or (iii) notify the Board of a desired benefit commencement date shall automatically be deemed an election to defer the benefit commencement date for the PRSB.

(Plan at 16). The Plan defines a "spouse" as "the spouse of surviving spouse of the Participant; provided, however, that a former spouse shall be treated as the spouse or surviving spouse to the extent provided under a Qualified Domestic Relations Order." (Plan at 9).

## II. Summary Judgment Standards

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). When making such a determination, the Court must construe the evidence and make all reasonable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Summary judgment is appropriate, however, when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a

verdict for that party." *Brummett v. Sinclair Broadcast Group, Inc.*, 414 F.3d 686, 692 (7th Cir. 2005).

### III.  Discussion

ERISA § 502 provides a cause of action for participants and beneficiaries of ERISA plans "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan[.]" 29 U.S.C. § 1132(a)(1)(B). A district court reviews a "denial of benefits challenged under § 1132(a)(1)(B) . . . under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). The Plan at issue in this case includes the discretionary language. Specifically, an amendment to the Plan provides, in relevant part:

> The Board shall have administrative and discretionary powers to:
> \* \* \*
> (b) find facts and make determinations as to the eligibility to participate and the rights of any Participant or Beneficiary applying for benefits; . . .
> \* \* \*
> (d) interpret the Plan.

(Plan at 33). Although no magic words are required, this language is sufficient to confer discretionary authority and trigger the arbitrary and capricious standard of review with respect to eligibility determinations and interpretations of the Plan. *Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014, 1019-1020 (7th Cir. 1998). Regardless of whether the Plan contains the discretionary language, the Court reviews *de novo* questions of law, such as issues of statutory interpretation. *Silvernail v. Ameritech Pension Plan*, 439 F.3d 355, 357 (7th Cir. 2006). For example, the Court reviews *de novo* the question of

whether a domestic relations orders is a Qualified Domestic Relations Order ("QDRO") for purposes of ERISA. *Hogan v. Raytheon, Co.*, 302 F.3d 854, 856 (8th Cir. 2002) ("These questions do not require the determination of the Plan's terms, and therefore de novo review was appropriate.").

Here, the question of whether the Plan properly denied Marker benefits under the Plan depends on the interplay between ERISA and state domestic relations orders. The Seventh Circuit has not decided the precise issues involved in this case.[1]

### QDROs under ERISA

ERISA contains anti-alienation provisions which generally prevent Plan participants and beneficiaries from assigning their rights under ERISA plans. With the Retirement Equity Act of 1984, however, Congress created an exception for Qualified Domestic Relations Orders from state courts. One of the Retirement Equity Act's "central purposes" was "to give enhanced protection to the spouse and dependent children in the event of divorce or separation, and in the event of death the surviving spouse." *Boggs v. Boggs*, 520 U.S. 833, 847 (1997). Congress set out in the statute the criteria for determining whether a state court domestic relations order is a Qualified Domestic Relations Order for purposes of ERISA.

---

[1] The parties seem to make much of the locations of the courts from which particular decisions came and little of which courts had the better analysis. The Court notes that no party has cited (and this Court has not found) an on-point decision by the Seventh Circuit Court of Appeals or the Supreme Court. This Court gives the cases the parties cite "no more weight than their intrinsic persuasiveness merits." *Colby v. J.C. Penney Co., Inc.*, 811 F.2d 1119, 1124 (7th Cir. 1987); *See also G.M. Sign, Inc. v. Global Shop Solutions, Inc.*, 430 F.Supp. 2d 826, 829 n. 4 (N.D. Ill. 2006).

If the state domestic relations order meets the statutory requirements (and, hence, is a QDRO under ERISA), then the Plan *must* comply with it, regardless of whether it agrees that the state court's order is proper. 29 U.S.C. § 1056(d)(3)(A). As the Seventh Circuit has explained:

> ERISA does not require, or even permit, a pension fund to look beneath the surface of the order. Compliance with a qdro is obligatory. 'Each pension plan *shall* provide for the payment of benefits in accordance with the applicable requirements of any qualified domestic relations order.' 29 U.S.C. § 1056(d)(3)(A) (emphasis added). This directive would be empty if pension plans could add to the statutory list of requirements for 'qualified' status. Any domestic-relations order that satisfies the statutory conditions 'shall' be paid
> \* \* \*
> ERISA's allocation of functions–in which state courts apply state law to the facts, and pension plans determine whether the resulting orders adequately identify the payee and fall within the limits of benefits available under the plan–is eminently sensible.

*Blue v. UAL Corporation.*, 160 F.3d 383, 385-386 (7th Cir. 1998).

**The Plan's denial of benefits was arbitrary and capricious because it failed to consider whether the order was a QDRO and failed to follow it.**

Because a plan's compliance with a QDRO is obligatory, the first thing the Plan should have done when it received a request for benefits from Marker was to determine whether Marker had submitted a QDRO. There is no evidence in the record that the Plan ever did this, despite multiple attempts by Marker to submit domestic relations orders. Rather, the evidence makes clear that the Plan improperly compared the domestic relations orders ("DROs") to the Judgment for Dissolution of Marriage and concluded that the DROs were not consistent with the Judgment for Dissolution of Marriage. According to the undisputed facts, the first time Marker submitted a draft domestic relations order, the Plan stated:

> The Marker Marital Settlement Agreement has been reviewed, and it has been determined, *due to the provisions of that document*, that you are not eligible for any pension payments, as the ex-spouse of Mr. Marker. The agreement provided that you be designated as the joint annuitant, at the time that Mr. Marker would

-9-

>have made a retirement election. Your agreement does not provide any pre-retirement election. Because he died before commencing any benefits, you are therefore ineligible to receive any benefits.

(Plan's March 17, 2003 Letter) (emphasis added). It was a mis-step for the Plan to look beyond the domestic relations order–rather than simply considering whether it was a QDRO–to consider whether the order was consistent with the Judgment for Dissolution of Marriage. Nothing in ERISA gives the Plan the right to look behind domestic relations orders to determine whether the state court was right. Indeed, ERISA forbids it. *See* 29 U.S.C. § 1056(d)(3)(A); *see also Blue v. UAL Corporation.*, 160 F.3d at 385-386 (7th Cir. 1998).

The record also lacks any evidence showing that the Plan considered whether the next three orders Marker submitted were QDROs. The parties have not submitted to the Court either Marker's second or third submissions or the Plan's response. The parties provided the Court with the domestic relations order Marker submitted to the Plan on August 9, 2004. On October 11, 2004, the Plan responded with a mostly-incoherent letter, which referred to prior denials and concluded by stating, "there are no benefits to be allocated to the Alternate Payee. Therefore, the file will be closed." (Plan's October 11, 2004 Letter). Thus, the Plan once again failed to determine whether the domestic relations order Marker had submitted was a QDRO. Its decision to deny benefits was arbitrary and capricious.

What the Plan should have done was first determine whether the order was a QDRO and second, if so, apply it.

**Plaintiff submitted a QDRO to the Plan.**

ERISA spells out the statutory requirements of a QDRO. A domestic relations order is a QDRO if it "creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan" and if the requirements of 29 U.S.C. § 1056(d)(3)(C) & (D) are met. Section 1056(d)(3)(C) provides:

> A domestic relations order meets the requirements of this subparagraph only if such order clearly specifies–
> (I) the name and the last known mailing address (if any) of the participant and the name and mailing address of each alternate payee covered by the order,
> (ii) the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined,
> (iii) the number of payments or period to which such order applies, and
> (iv) each plan to which such order applies.

29 U.S.C. § 1056(d)(3)(C). Section 1056(d)(3)(D) provides:

> A domestic relations order meets the requirements of this subparagraph only if such order–
> (I) does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan,
> (ii) does not require the plan to provide increased benefits (determined on the basis of actuarial value), and
> (iii) does not require the payment of benefits to an alternate payee which are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order.

29 U.S.C. § 1056(d)(3)(D).

The Court concludes as a matter of law that the July 26, 2004 Circuit Court Order (the only one the parties have submitted) is a Qualified Domestic Relations Order. First, the Order meets the requirements of 29 U.S.C. § 1056(d)(3)(C). It contains the participant and alternate payee's names and last known addresses. It also describes the amount of the benefit by stating that Marker "shall be treated as a surviving spouse of the Participant for the purposes of any pre-

retirement survivor benefit payable under the Plan based on the interest awarded under Paragraph 4," which paragraph stated that her interest was to be 100%. In other words, the Order stated that plaintiff is entitled to 100% of the surviving spouse benefit payable with respect to Robert Marker.

Second, the Order meets the requirements of 29 U.S.C. § 1056(d)(3)(D). Pursuant to that section, an order is a QDRO only if it "does not require a plan to provide any type or form of benefit, or any option, not otherwise provided under the plan." *See* 29 U.S.C. § 1056(d)(3)(D)(I). The Order at issue here does not require the plan to provide any type or form of benefit not otherwise provided. Rather, the Order provides that Marker be treated as a surviving spouse for a pre-retirement benefit, which is a benefit clearly provided on page 16 of the Plan. ERISA further provides that an order is a QDRO only if it "does not require the plan to provide increased benefits (*determined on the basis of actuarial value*)." *See* 29 U.S.C. § 1056(d)(3)(D)(ii) (emphasis added). What that section plainly means is that if the actuarial value of a benefit is, say, $50,000, an order is not a QDRO if it requires the Plan to pay, say, $60,000. Nothing in the order requires the Plan to pay increased benefits, as measured by actuarial value. The Order requires the Plan to pay the plaintiff the surviving spouse benefit, not, say, 125% (or some other increased amount) of the surviving spouse benefit. Nor does the fact that plaintiff submitted the QDRO after Robert Marker's death mean that the Plan is on the hook for increased benefits. The Plan explicitly provides that post-death notice means the payments are *deferred* not waived. *See* Plan at 16-17 ("failure of any eligible Spouse to (I) notify the Board of a Participant's death; (ii) maintain a current address on the Board's records; and/or (iii) notify the Board of a desired benefit commencement date shall *automatically* be deemed an election to

-12-

defer the benefit commencement date for the PRSB.") (emphasis added). Thus, the July 26, 2004 Order is, as a matter of law, a QDRO.

### ERISA does not contain a deadline for submission of QDROs.

Notwithstanding the facts that the domestic relations order presented to the Plan was a QDRO and that compliance with a QDRO is mandatory, the Plan argues that it did not need to comply with the QDRO plaintiff submitted because it was submitted after Robert Marker's death. The Court next considers whether anything in ERISA imposes a deadline for submission of a QDRO.

The Court is unable to find a provision in ERISA (and the parties do not point to any provision) that sets a deadline for alternate payees to provide a QDRO to the Plan. Rather, the scheme set out in ERISA suggests the absence of a statutory deadline. ERISA contains provisions that require a plan to segregate the benefits that would have been payable to the alternate payee "during any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined (by the plan administrator, by a court of competent jurisdiction, or otherwise." *See* 29 U.S.C. § 1056(d)(3)(H)(I). ERISA states that if it is determined within the "18-month period" that the order is a QDRO, then the segregated money is paid to the alternate payee. *See* 29 U.S.C. § 1056(d)(3)(H)(ii). If it is determined that the order is a QDRO *or* if the QDRO issue is unresolved, then the plan pays the segregated amount to the person who would have been entitled to the amount absent the order. *See* 29 U.S.C. § 1056(d)(3)(H)(iii). Under ERISA, the 18-month period begins "with the date on which the first payment would be required to be made under the domestic relations order." *See* 29 U.S.C. § 1056(d)(3)(H)(v). Finally, the statute provides that if the determination that an order is

a QDRO is not made until *after* the 18-month period has ended, the benefits are applied "prospectively" only. *See* 29 U.S.C. § 1056(d)(3)(H)(iv). Section 1056(d)(3)(H)(iv) means that the only penalty written into ERISA for delayed submission of a QDRO is that the alternate payee runs the risk of receiving benefits only prospectively. No other provision in ERISA suggests any other deadline or consequence for delayed submission of QDROs to a plan. Accordingly, this Court agrees with those courts that have concluded that posthumous domestic relations orders can be QDROs. *See Hogan v. Raytheon*, 302 F.3d 854, 857 (8th Cir. 2002) ("the fact that Mr. Hogan died prior to the entry of the March 9, 1998 Order is irrelevant."); *Galenski v. Ford Motor Co. Pension Plan*, 421 F. Supp.2d 1015, (E.D. Mich. 2006) ("Despite Defendant's assertions to the contrary, the Court finds no provisions in ERISA that require that the QDRO be entered prior to the death of the participant."); *IBM Savings Plan v. Price*, 349 F. Supp.2d 854, 860 (D.Vt. 2004) ("the weight of authority strongly supports the view that a QDRO may be entered retrospectively after the death of a plan participant."); *but see Guzman v. Commonwealth Edison Co.*, Case No. 99 C 582, 2000 WL 1898846 at * 2-3 (N.D. Ill. Dec. 28, 2000) (Brown, J.). The Court disagrees with those courts that have concluded otherwise, because, among other things, they did not consider the language of § 1056(d)(3)(H). Nothing in ERISA prohibits the submission or enforcement of posthumous QDROs.[2]

---

[2]The Court notes that it also did not find in the Plan itself any provision setting a deadline for submission of a QDRO. (Because ERISA says plans should set out procedures, the court will assume, without deciding, that an ERISA plan has the right to set such a deadline. *See* 1056(d)(3)(G)(ii).) The parties do not point to any provision of the Plan that sets a deadline for submission of a QDRO, and the Court does not find one. Rather, this Plan anticipates delayed noticed of the participant's death. The Plan's provision on the Preretirement Spouse's Benefit at issue here states:

failure of any eligible Spouse to (I) notify the Board of a Participant's death; (ii)

The Court understands that some courts, when concluding that ERISA does not prohibit posthumous submission or entry of QDROs, have relied not only on ERISA's language (which this Court has relied upon) but also on the fact that, in those cases, a state court had entered a domestic relations order granting an alternate payee the right to the benefits before the participant died and then entered a QDRO after the participant died. *See Files v. ExxonMobil Pension Trust*, 428 F.3d 478, 491 (3d Cir. 2005) (concluding that, regardless of whether the plan was aware of the pre-existing interest, "[n]othing in the statute, or in our precedent, requires that a QDRO be in place prior to the death of a plan participant when the QDRO that is ultimately obtained by engaging in the statutory process simply seeks to enforce a separate interest in a pension benefit that existed before the death of the plan participant."); *Trustees of the Directors Gild of America-Producer Pension Benefits v. Tise*, 234 F.3d 415, 422-423 (9th Cir. 2000) ("[ERISA] necessarily permits an alternate payee who has obtained a state law DRO before the plan participant's retirement, death, or other benefit-triggering event to perfect the DRO into a QDRO thereafter (subject to the 18-month period after which any previously-due benefits are payable to the original beneficiary)"). This Court, in concluding that a Plan must comply with a posthumous QDRO, relies on ERISA's *language* alone and not on the existence or non-existence of a state-court judgment or domestic relations order that pre-dates the participant's death. Given that Plans (in the Seventh Circuit, anyway) are not allowed "to look beneath the surface

---

        maintain a current address on the Board's records; and/or (iii) notify the Board of
        a desired benefit commencement date shall *automatically* be deemed an election
        to defer the benefit commencement date for the PRSB.

(Plan at 16-17) (emphasis added). This language does not mean that the surviving spouse forfeits the benefits if she does not claim them by a certain deadline; it means that any delay constitutes an election to defer benefits.

of" a QDRO (*Blue*, 160 F.3d at 385-386), it makes little sense to require Plans to distinguish between those posthumous QDROs that are connected to an earlier order and those that are not in order to determine which QDROs require compliance.

The Court appreciates that in some cases, mandatory compliance with a QDRO could force a troubling result on the Plan. It could, for example, force the Plan to comply with a QDRO that seems contrary to a prior judgment for the dissolution of marriage. But Congress made compliance mandatory, and the Seventh Circuit has already stated that the Plan cannot consider whether the QDRO is proper under state law. Perhaps there will be a rare occasion when a Plan is forced to comply with a 'fishy' order, but the Court thinks that Plans are protected by 1) the adversarial nature of the state proceedings; 2) the state appellate process; and 3) the integrity of state courts. If a Plan suspects a problem with a state court's handling of a QDRO, it should probably attempt to intervene in the state court action.

The plaintiff is entitled, as matter of law, to surviving-spouse benefits under the Plan.

### **Plaintiff was not required to exhaust her administrative remedies.**

As defendant points out, the "decision to require exhaustion as a prerequisite to bringing suit is a matter within the discretion of the trial court." *Powell v. AT&T Comm'n., Inc.*, 938 F.2d 823, 825 (7th Cir. 1991). Normally, the Court would require exhaustion, but it finds that this is one of those rare cases when exhaustion would have been futile. The plaintiff tried for more than a year to get the Plan to accept various domestic relations orders as a QDRO. The Plan, instead of considering whether the submitted documents were QDROs, repeatedly told plaintiff that she was not entitled to benefits under the Marital Settlement Agreement and that she need not bother sending any other DROs because none would be accepted. *See* Plan's March 14,

2003 Letter ("Any QDRO that you might provide will be rejected as unacceptable under ERISA . . ."). In its final communication, the Plan (in a largely-incoherent letter) referred to prior letters and stated, "there are no benefits to be allocated to the Alternate Payee. Therefore, the file will be closed." The letter made no mention of an appeal process. Thus, while the Court would ordinarily require exhaustion, it believes exhaustion would have been futile in this case.

## IV. Conclusion

For the reasons set forth above, the Court denies defendant's motion for summary judgment and grants plaintiff's motion for summary judgment. The Plan shall pay plaintiff surviving spouse benefits pursuant to Section 3.4 of the Plan. The Clerk of Court shall enter judgment accordingly.

ENTER:

_/s/ George M. Marovich_

George M. Marovich
United States District Judge

DATED: October 4, 2006